May it please the court. Good morning. Good morning, Mr. Parrish. You may proceed. After six debriefings, including a polygraph, which showed no deception, a plea, a forfeiture of $33,000, Mr. Hertz wanted to explain to the district court judge why his level of cooperation was so substantial and why he should have gotten a $5,000 departure. That hearing basically went off the rails on an issue related to whether or not, in cross-examination, his baby was knocked out of his hands when the officers came in for an arrest. Two factors that this court can look at in deciding not to grant what could be considered deferential treatment to the ruling of the district court judge. If a factor is considered, a relevant factor that was not significant, the court can look at that. The other way it can look at it, it gives greater weight to a factor that was not part or should not have been considered. And that's what happened in this case. The idea of the cross-examination where the court, prior to the time that Mr. Bassam Hertz had an opportunity to explain what he meant, even though his native language was not English, only became acquainted with the English language to the extent where he was, in fact, could speak it clearly when he was 16 years old. He misspoke during his cross-examination. When he misspoke during his cross-examination, the question became whether or not his credibility was at issue. And I know in the Denton case, this court has said, we're going to give you great deference on credibility findings, but credibility finding with regard to an issue that is significant. The issue as to whether or not his arrest had problems was not significant to his pre-sentence investigation, was not significant to whether or not a variance was going to be granted. Counsel, do you agree, though, Congress has told us that the sentencing judge should consider the characteristics of the defendant? Absolutely, the characteristics should be considered, and they were considered. And the fact that he had debriefed that number of times was, in fact, significant. But his characteristic as to whether or not when the officers came in to arrest him, which later turned out to be somewhat accurate, and I mean accurate in the sense there was a black eye shown on the photographs later that the judge on the first day she looked at it on the U.S. Attorney's phone, turned out not to be accurate. He did ask for medication, which later turned out to show because of his headache. And he had complained about the fact that he had been hit. But this is a gentleman who debriefed his first day. He also gave an extensive debriefing for almost an hour and a half. He continued to debrief straight through. He also debriefed with his lawyers present. And his explanation of that point is whether or not he should be entitled to more of relief from the government by a 5K motion. He never got the hearing to determine whether or not the government was operating in bad faith. The court enhanced his penalty by 18 months, 19 months, based upon the fact that she did not accept his credibility on the issue of whether or not he was hit in the head when the officers came in to arrest him when he was still holding his baby. And the record later established that he was hit in the head by his own testimony. But the judge made her decision the same day that the issue came up on cross-examination. Do you think by her quotation she's referring to three things, concerns of credibility, lack of completeness, and because of what he has done has not substantially assisted? Do you think she's got three separate reasons? But if she emphasizes one that's incorrect, that's when this court can take a look at what her decision was based upon. She can have two legitimate ones, but you can't give her a free ride because she uses a third one that this court has a duty to look at if it finds out that it overemphasized a particular fact or, on the other hand, she used a fact that was irrelevant for consideration. This was a collateral issue. This had nothing to do – You say it's insignificant, but it's like beauty is in the eye of the beholder. Maybe significance is in the ear of the listener. Of course, the beauty is out of the hole, as John Keats would say. But I think, on the other hand, you have to look at what this court has instructed the judge to do with regard to collateral issues. This was a collateral issue. In your eyes, yes, but maybe not, as Judge Benton has pointed out. Well, how can she look at that cross-examination question with no opportunity for him to explain until later, which he did explain, and it turned out that it had a lot more credibility than the judge had given. But if you follow her train of thought, which she does put on the record over and over again – Well, she makes it very – I mean, the judge made it very clear that it was significant to her. It's significant to her, but it's a significant factor that should not have taken 19 months and added to his sentence. Was it collateral if she found that he made a false statement about what happened at the arrest in order to discount the admission he made about the number of guns? That's not collateral, is it? Correct. The number of guns never became an issue. If you follow through with the sentence, it never came back as an issue. It never came back as an issue again, and he never challenged the number of weapons. So, therefore, it became collateral to that question. Let me just make sure I understand the facts. What number did he give in his statement? Eighty. Okay. Eighty, and they challenged that 80 and asked him why did he do that. He says, well, the reason I gave 80 because I had been hit in the head, and my memory was not that clear at that point in time. You mean he later – did he later take the position that 80 was incorrect? Never. If you follow the sentencing, it never came to be an issue. That's what makes it a collateral issue here. I see my time is up, and I don't want to take away from other counsel's time. I don't think Judge Waldman would do that. I want to save my one minute. I don't know about that. We'll give you a minute. Thank you, Judge. Mr. Hopwood? Yes, Your Honor, and may it please the Court. Let's see. You might want to raise the lectern a bit. Oh, that's okay. To the right. There you go. There we go. Is this better? The district court here erred in two important respects. First, the district court erroneously applied a leader-organizer role based on facts from the pre-sentence investigation report that were disputed and the government never disproved. As to the undisputed facts, they merely showed that Mr. Hertz had different job responsibilities from his other co-defendants in a conspiracy where decision-making was equally shared and profits were equally split. What about his statement off the bat that he told his son and his brother about this idea and they agreed to participate? That sounds like the leader. Under the guidelines commentary, it says that it is irrelevant to leader-organizer if someone merely suggested committing the offense. That was also included by the probation office when the government made the same argument that's in the PSR. So that does not show mere leader-organizer. Again, your opening statement, one of them was, the government never disputed or discounted? So there was factual objections made to the PSR. One of the factual objections was to paragraph 151 of the PSR, which says that Mr. Hertz directed Adam and Sarah. He disputed that. The government never disproved that at the sentencing hearing, and so this court cannot rely on that in affirming the leader-organizer role here. What do you mean the government never disproved it? The government never proved that he directed Adam or Sarah, and because there was an objection to the PSR, it was their burden to prove that, and therefore this court can't rely on him directing other co-defendants to uphold the leader-organizer role. Well, but it can rely on facts in the PSR to which there was no objection. Yes. There was an objection made here. Oh, there was an objection to one paragraph. Yes. But other paragraphs that had facts to which there was no objection are properly considered by the court, right? Yes, and this court has always said control and having authority over underlings is necessary for leader-organizer. If you take away paragraph 151, there was no evidence that he directed other co-defendants or underlings. This was a conspiracy in which all three participants equally shared decision-making authority. You know that because when Mr. Hertz tried to exercise authority on his own, the conspiracy dissolved because Bossam got angry about it. As to the facts that were undisputed, all those show is that Mr. Hertz had different job responsibilities, but again decision-making was shared amongst the three people. I thought he directed Adam and Sarah as to which guns to buy. That is the factual objection to paragraph 151 I'm talking about. There was a factual objection where? The government cites paragraphs 51 and 69 on that point. That what Judge Benton said, that your man had directed the others to buy guns and which guns to buy. He specifically objected in the objections to the PSR that he did not direct Adam or Sarah about which guns to buy. It would be strange for him to have directed Adam considering all the evidence in this case shows that Adam was an equal participant who shared decision-making along with Bossam, and they evenly split profits. So you have a conspiracy here where all three people equally shared decision-making authority. You cannot rely on facts that he directed other people because that was disputed and the government never proved evidence at the sentencing hearing. I thought it was undisputed that the duration, number, and frequency of his purchases greatly exceeded anybody else's, and the others added together. That is true, and he admitted to that in the objections that he had a different job responsibilities. One of his responsibilities was to package the guns and send them to Lebanon, but he also acknowledged that that was in agreement with his two co-conspirators. The government never disputed that, and so yes, he had one job responsibility, but Bossam had other job responsibilities. Your case is that they're partners, right? Yes. Was there a managing partner of this deal? No. Not any managing partner? No. All of the decisions made about how to sell the firearms, what the price was for the firearms, was decided by all three partners. The profits were equally split between those partners. The only time that profits were not evenly split was when Mr. Hertz and Bossam provided more money for buying the guns than Adam did. The district court also erred in taking away acceptance of responsibility based on a legal objection that the probation office partly sustained as to how many firearms were part of jointly undertaken criminal activity. A defendant cannot be punished for making a legal objection that was partially sustained by the probation office. If you agree with us on either of these points, the court must remand and reverse, even though the district court said it would impose the same sentence regardless of the guideline calculations, and the reason for that is the government waived any right to harmless error review by not raising it in their brief. I see that my time's up. I'm going to save the rest for rebuttal. Very well. Thank you. Mr. Johnson? Yes, Your Honor. Good morning. We note that you were appointed under the criminal justice act. Yes, I was, Your Honor. And the court deeply appreciates your willingness to accept the assignment. It is my pleasure, Your Honor, and I appreciate the court taking time to hear from us this morning. May it please the court, counsel. Your Honor, the issues that I want to focus on this morning is primarily related to role in the offense, but kind of coming from the opposite direction of what Mr. Hopwood just raised. The issue in this case is whether or not the court correctly denied the defendant's request for a downward departure based on role in the offense. It wouldn't be a departure, would it? It would be an adjustment. Excuse me, an adjustment, Your Honor, yes. Basically, obviously, the four for minimal, three for the in-between, or the two for minor. And the court denied those and frankly gave a high end of the guideline range sentence to Ms. Sater. Frankly, Mr. Hopwood's argument is somewhat telling in this case in which he refers to three co-conspirators a number of times. There's four defendants in this case. Ms. Sater was unquestionably a lesser participant in this case. She opened the bank accounts. She fibbed and said she was a U.S. citizen. She managed the money. She went along to buy guns. She got the permit for the guns. She traveled internationally. Doesn't sound minor to me. She did travel internationally, Your Honor. The issues, frankly, in this situation are, as the court is obviously well aware, is Ms. Sater was married to Bossom Hertz, who is Mr. Parrish's client. He was obviously the one who was one of the ones who was originally in this scheme. Everything that was done in this case was done at his direction. He was present when the bank accounts were opened. He was present at every single one of the firearm purchases. She never made any online purchases of firearms. She never contacted any purchasers. She purchased out of the 252 guns that were shipped and the approximately 200 and some that were actually traced and purchased, she purchased 13 of those firearms. She went along when other guns were bought, though, right? She was present when other guns were purchased. She was present, I think, predominantly, though I don't have the exact numbers in front of me. I think predominantly those were purchased at stores, for lack of a better term, you know, shields and those types of stores. When we're looking at this, when we're looking at substantially less culpable defendants, one of the things that we're kind of looking at is obviously measuring the participants' individual acts versus the relevant conduct and the elements that they pled guilty to. In this case, again, Ms. Zader personally purchased 13 firearms. She was in a situation where she received an eight-level upward adjustment for 100 to 199 firearms because of the nature of the conspiracy law here. Again, she did receive the eight levels for transporting and trafficking, though we did withdraw our objection to that based on some of the Eighth Circuit's, frankly, law in that situation. Just looking at the application notes on the minimal minor participant, in terms of what the court is directed to consider, Ms. Zader, she did understand the scope of this because her husband was one of the leaders and organizers, and she did benefit financially. There's no question about that. But in terms of planning and organizing, there was zero participation on that end of things. Everything was done solely at her husband's direction. The bank accounts, frankly, the bank accounts were open in her name. She did take some inventories, again, at the direction of her husband. Well, why does that make her a minimal participant as opposed to just a regular zero-level participant? I mean, the mere fact that she was directed by an organizer doesn't mean that she's a minimal. No, but I wouldn't consider this to be the typical direction of an organizer as, you know, potentially, for instance, a drug conspiracy or an unrelated circle of people who are purchasing firearms such as this. This was a situation where she was married, that this was a she was new to the country. She was the most recent immigrant of any of the folks in this case. She had a very young child. She had specific pressures on her that, due to her family situation and due to her relationship with Bossom, that creates a different role than maybe if, you know, Joe is taking orders from Frank. There's a different relationship there. There's a different amount of pressure that influences, again, her ability to be decision-making, which is also one of the application notes. What did the district court say about this point, that the spousal relationship is mitigating? If I recall, not a whole lot. We did raise both the spousal relationship as well as also some cultural relationship between spouses, people from Lebanon. The court was dismissive of that, I think is fair to say. All right, well, we can reread it. Culpability can't be measured with mathematical certainty. Does the district court have to have a checklist? So many points for doing this, so many points for going overseas? No, Your Honor. And subtract other things from it? And frankly, I think that that's part of the reason why there's this difficulty in these types of cases from our standpoint when we're arguing to you, is that obviously the court is going to be deferential to the district court. But at some point, if the uphill climb that we have here is impossible, then there's just no reason to have to climb. Did anyone else have a permit to buy the guns and renew a permit? She did have a permit. She did renew it. As far as I can recall, Your Honor, I believe everyone had a permit to purchase. And I see I'm winding down, so I will reserve the rest of the time for rebuttal. You make a nice point. It's an uphill climb, but it's not an impossible. Even Everest is an uphill climb. Exactly. So that's my viewpoint. Thank you, Your Honor. We'll hear from the government. Mr. Murphy. Good morning. You may proceed, sir. Please, the court, counsel. Appreciate the opportunity to respond to the issues raised by the defendants. I'll take them in order that they appeared here. First, Mr. Parrish complains about his client, the court considering the fact that his client lied at sentencing. We've cited the Supreme Court decision in the, I believe it was the Grayson case. The court is very clear that matters of somebody lying is certainly relevant to sentencing. Grayson case, 438 U.S. at 50. What was he trying to accomplish, in your view, by lying about the police conduct? Was he trying to discount the 80 number of guns that he'd given the first time, or what? Yes. First of all, Mr. Parrish, in calling his client, said he was calling him on issues of roll and downward variance. The question of roll is the number of guns that he purchased, the number of guns that he was involved in, the number of transactions that he was involved in, in our estimation, was relevant. I mean, what did he say? I told him 80, but it was really less than that? What he said, he was questioned about, he said, didn't you actually, first of all, in the pre-sentence report he was held accountable for a total of 56 guns. I said, isn't it a fact that on the first day that you were interviewed, and again, this really gets into the weeds, but he was arrested on May 12th. He was not interviewed with counsel until May 19th. He was interviewed, a Miranda interview, on the first day. He lied about a number of things. I cross-examined him about a number of those. There were 10 matters that I briefed to the district court that I thought that he lied about at sentencing. But in any event, so the sequence is, he talks to the police on May 12th, is not completely truthful by any means on that day. May 19th, he then talks with a lawyer, and that's when he says that he personally bought about 80 guns. I then question him and say, didn't you admit 80 guns, and you're only held accountable for 56 here? And he says, that was just a random number, just came out of my mind, because they beat me up and they threw my baby on the floor, so I was under pressure. That's the transcript, page 98. And I point out to him, we're not talking the day of the arrest. We're talking a week after the day of the arrest. So he's trying to minimize the number of guns, and it goes from there. It goes on from there. The court then is very concerned about him saying the police beat him up. Police threw the baby on the floor. We then have another hearing. We present evidence that he wasn't beat up. He claims that a door hit him in the head. He presents a photo that shows some discoloration. He calls his initial attorney to say there was some discoloration. He didn't know what the discoloration was from. The police say, no, when they entered the house, the baby wasn't on the floor. The wife was holding the baby at a distance from the door. There were a number of other things. The bottom line was the court ended up, the court was, I would say, fairly exercised or concerned about this. It wanted evidence on this issue. It was not an issue until the second hearing. There were four hearings. It took four hearings to get this defendant sentenced. And the court, in the fourth volume, repeatedly, repeatedly finds that the defendant lied. She was upset that he had lied. She says he flat-out lied. In the transcript in volume four, she makes numerous references to pages 246. You can call it a flat-out lie. 247, the defendant lied. 249, the defendant lied. There was no question about it. And she says, she even called it obstruction of justice. It was clear that he obstructed justice. She ended up not imposing an obstruction enhancement. But clearly, if a defendant takes the oath to tell the truth at a sentencing about a fact, the number of guns, which is very important, and a number of other matters, again, that I pointed out in my brief. And the court finds that he lied, that he flat-out lied. I respectfully submit that's a relevant factor. It's not an improper factor. And moreover, the court said this was one factor. In explaining its sentence, it was one of many, many factors that the court cited. This was not the overriding factor in the court's imposition of sentence. The sentence the court imposed was a sentence below the range. The range was properly determined. The court imposed a sentence of 18 months below the range to give him, or I'm sorry, this was a sentence, I'm getting my defendants mixed up, this was a sentence within the range. It was the top of the range. Top of the range. Properly determined range. So it's presumptively reasonable. Was the 80 a random number in the end, since the government's position was 56 is the correct number? Maybe he didn't lie about 80 being a random number. You're saying he just lied about what happened with the police. I wouldn't say our position was it was 56. I would say that we took the conservative numbers all the way through, and there's testimony about this in the various hearings. We accepted the conservative numbers for purposes of calculation. And so we accepted 56 and went from there. And we could still meet our burden as to the various levels. So we didn't know exactly the number of guns. Again, there's testimony about this from the ATF agent. We didn't know the exact number of guns. The ATF doesn't keep a directory of numbers of guns. We had to do manual searches, that type of thing. So we know we were able to document so many guns, 252 guns, but we highly suspect there were many, many more. Next, to Mr. Herz, objecting us to roll factual objections to the pre-sentence report. We're talking about Ali? Ali Herz. I'm sorry. You confused us. Go ahead. I'm sorry. Ali Herz. Ali Herz. And the defendant alleges in his brief that the government didn't present any evidence. Well, we certainly did. We presented the plea agreement, the stipulations, extensive plea agreements in the plea agreement. Extensive stipulations, I'm sorry, in the plea agreement in paragraph 17. There were, of course, unobjected portions of the PSR, including paragraph 51, which is significant. That's a paragraph, Judge Carlton, you noted. But that paragraph, 51. Yeah, you cited 51 and 69. It looks like there was an objection to 69. 51 says, Ali Herz directed Adam Herz as to which guns to buy. Zader purchased her first gun in 2014. Purchased six more guns in 2014. Directed, he stipulated to that. Says we didn't present evidence. There's testimony of two agents. We presented evidence of testimony of two agents. We put 15 sentencing exhibits. The court accepted the pre-sentence report, transcript 110. The stipulations were largely incorporated in the pre-sentence report. This defendant's actions significantly differed from the other defendants here. He had a significantly larger number of guns. He had 86 guns out of the ones that we were able to document. The next highest was Bess M. Herz, who had 56 guns. And Adam Herz had 63 guns. But aside from that, Judge Benton, you noted what the defendant had said, that he had talked to the Essenes, who were the customers. Two of the customers in Lebanon talked to them in 2014. And then talked to Adam and Bess M. about this idea. There was other evidence that maybe Bess M. was the one who started the notion. The bottom line is that Bess M. and Ali were the highest. They were the ones most responsible. Ali was the oldest member of the family. Bess M. was his younger brother. Adam was Ali's son. Sarah was Bess M.'s wife. The son took direction from the father. The wife took direction from the spouse. The activity started in 2013, December 2013, with the opening of bank accounts, other activity, gun permits. Sarah and Bess M. get gun permits in 2013. Those are the first two to get gun permits in December 2013. They got the gun permits so they could legally buy guns. First shipment goes over to Lebanon in March of 2014. After that shipment, everybody left the country. They left the country intentionally to be out of the country in case the guns were interdicted. This included Sarah, included Bess M., included Adam. They get to Lebanon, and Bess M. lines up a meeting with Yassin and Bilal over there. Ali takes the lead on selling the guns, and that's in the plea agreement of paragraph 17, double S. He stipulates he was the person primarily responsible for making the final decision as to whom the firearms would be sold to in Lebanon. They all discussed general prices, they wanted for guns, but he was responsible for arranging the first two shipments to be transferred to his home in Lebanon and for negotiating with the buyers on these guns. He received significantly more money. So there was another shipment in September or August, August-September of 2014. Then there was a split in January where Bess M. and Sarah split off. They send their own shipment. Bess M. organizes that shipment with his wife Sarah. Sarah intricately involved, they're buying guns. And that shipment goes in March. We interdict that shipment in Norfolk, Virginia. They don't know it. They make plans to travel overseas. At the same time, Ali and Adam are setting up their own additional shipment. That's in May of 2015, and we interdict that shipment. And we seize 99 guns out of that shipment and take the whole thing down at that time. So as far as Ali's role, he was involved in the first, second, and the fourth shipments. However, he gave Bess M. information for a customs broker in Lebanon who they used, who was at the port who would facilitate the transfer of the container from the port to Ali's house in Lebanon so it could be unloaded at his house. Ali gives Bess M. the contact information for the customs broker in Lebanon so he can use it on his shipment that he's lining up with his wife in March of 2015. Now, he emphasizes that profits were split equally. To what extent do you believe that's true? That's not true. That's not true. The profits were not split equally. In fact, Bess M. got a greater share of profits on the first shipment, if you will. He received $20,000 for that shipment. Ali and Adam received $15,000 for that. And, in fact, when they came back, so this was after March, they came back from Lebanon in about June. When they came back in June, they brought $20,000 in cash. Bess M. and Sarah did. And at the border, they split it up. They each take $10,000 so that they wouldn't have to report the cash coming back in the country. That's Sarah who wasn't involved but who had a gun permit, who was aware of things, who was traveling already at that point. She didn't begin to buy guns, actually to buy guns, until after she returned. But she did buy 13 guns, usually bought one gun, and usually accompanied Bess M., and usually with the child, with an infant child. So going into the gun store, oh, it's just this woman with a child buying one gun. Isn't that, you know, an innocent, nice little situation, person exercising her First Amendment rights? And we believe that was true. Second Amendment. I'm sorry? Second Amendment. Second Amendment rights. I'm sorry. Some people think it's the First Amendment. And perhaps. Maybe she talked him into it. So in any event, and there was evidence presented. Okay, what about the other fact that they stress? That whenever, at the very end of this deal, when Bess M. did not like a decision Ali made, then Bess M. ended the partnership, and that shows they were equal partners. Well, no, what ended it was the fact that Ali, after the September-August shipment, had developed a relationship with Bilal Yassin and with Ali Faki, who was his cousin. They're gun dealers in Lebanon. And they provided over $100,000 in cash to Ali, $100,000 to be used to buy more weapons. Ali didn't tell Bess M. about that. And that, shall we say, ticked off Bess M. And ultimately, when he found out, that's what caused them to split in January of 2015. But they did end the deal then, right? The partnership then? That's when the partnership ended. And it's stipulated that's an agreed, non-disputed fact in the pre-sentence report in January of 2015 is when that ended. So it was really the fact that Ali was cutting a side deal, getting money that he wasn't disclosing, that was a big part of it. There was also evidence that Bess M. believed that he should be receiving a greater share, not a one-third share. And he was actually receiving more money on the first two shipments because he paid for the expenses. He and Ali fronted the expenses for those first two shipments, which shows their greater role also. But he thought he should be getting a fourth share because his wife was involved. So that's what caused the problem, along with the fact that Ali had made this deal and gotten a significantly greater amount of money that he didn't disclose. Did these people all live in Cedar Rapids? I'm sorry? Did these people all live in Cedar Rapids? Yes, Your Honor. And the other thing that I would keep in mind is people say there's references here, there's three, there's four people involved. No, there was more than that. We had Fadi Yassin, who was in Lebanon, who we have subsequently arrested and convicted in the United States. There was Bilal Yassin. There's Ali Faki. There were a number of other people that were involved in this conspiracy. Ali al-Hurs was directing those people and making decisions with regards to them in Lebanon as well. So this is a much broader issue. And with regards, although the role wasn't addressed by the Semhurs, but he sought a two-level role. The court imposed a three-level adjustment for role. There was never any issue about whether or not the offense involved five or more people or was otherwise extensive. Never any issue raised on that point. And the only difference between two and three levels is whether or not there were five or more people involved or the offense was otherwise extensive. He claims he should be two. He would have to be a manager or supervisor to be two. So he's a manager and supervisor by his agreement, and he doesn't challenge the other element. The court clearly didn't err in finding a court. This court, I would submit, can't find on that record that the court erred in assessing role on him. Finally, Sarah Zader, I've really touched on it as I've gone here on the issue of role, but argues that she took direction from her husband. No doubt she did, but he got an increase in the role for his conduct in directing her. That does not mean she's entitled to a reduction for role. And as I've cited in my brief, this court has held that if a defendant is deeply involved in the offense and had knowledge of the scope of the conspiracy and the structure of the conspiracy and observed others' activities in the conspiracy, that she can hardly be considered for a lower role. And that accurately describes this defendant. I believe Mr. Johnson actually admitted she certainly was aware of the activities of others. She was not also, you have to look at relevant conduct, she wasn't held accountable for the first shipment, for the guns in that first shipment, because she didn't start to buy guns until they came back from Lebanon. And she opened the bank accounts before or after the first shipment? She opened the bank accounts in December of 2013. Before or after the first shipment? Before. Thank you. This is irrelevant but interesting to me as a farm boy. I wonder why they use Bobcat loaders to ship these guns. Well, they have a cowling over the motor compartment that has a fairly large void in there. And as I understand, they believe they can put the guns in that void, and then if there was an X-ray at the port or something, there's enough of a metal mass with the engine and with the cowling that the X-ray would not detect the weapons. Plus, the Bobcats had a resale value in Lebanon. I wonder what it cost. I'm not going to ask how much it cost to ship a Bobcat to Lebanon. I don't remember what the cost of the shipping, I apologize, I don't remember. Irrelevant but interesting, so we'll go on. The shipping cost. And then as far as the spousal relationship, I believe Judge Carlton, you'd asked a question about that, and the argument was made at sentencing that this was because of the spousal relationship and the cultural norms of Muslims. And as Judge Reed noted at sentencing, she did find at sentencing that there was no evidence of that. There was simply no evidence before her on that point. So there was nothing to consider on that point. I'm about out of time. I have nothing else unless the Court has any additional questions. Thank you for your argument. Thank you. Rebuttal? Does anybody have time for rebuttal? We'll give you a minute. I would just like to point out that in the use of the Grayson case, I want to point out to the Court that in the Grayson case, it went to the merits of the defense. As a matter of fact, there's a statement by the district court judge, in my view, that your defense was a complete fabrication without the slightest merit. That's a different issue than what happened here, Judge Carleton and Judge Woolman, on a collateral issue. You said, well, yeah, you could find out that perhaps it was relevant because it's an eye of the beholder, but the eye of the beholder has to be something that impacts the sentencing. And if you look at the order of the brief, we're confident that you're going to find out in your ruling that this was not a proper consideration of the Court, this collateral issue regarding the child being injured. Thank you. Very well. Mr. Hopwood? Yes. The leader-organizer rule turns on the factual dispute about whether OLLI-directed other co-defendants are underlings. This Court's case has said that is necessary to imposing the leader-organizer rule. I'd refer to United States v. Laws, which is 819, Fed 3rd at 388. I also misspoke about what paragraphs defense counsel was objecting to. 151 is the district court docket at page 2 where the objection was made. To paragraph 51 of the PSR, it says defendant did not direct Adam Hertz nor Sarah Zeder as to which guns to buy. You will not find anything in the plea agreement, the sentencing exhibits, or the sentencing hearing that addresses that point. As a result, you cannot give the leader-organizer rule. That he never directed any of the other co-defendants or the underlings. Why doesn't the pre-sentence report then show an objection to paragraph 51? I don't know, Your Honor. The final report goes through and lists objections throughout when there's an objection made, but on 51 there's no objection listed. I don't know why that was. I wasn't counsel below, but I can tell you the objection was made because I'm reading from the actual document. What does the document say? It says paragraph 51, defendant did not direct Adam Hertz nor Sarah Zeder as to which guns to buy. What document is that? That's the objections to the pre-sentence investigation report. That's at the district court docket 151 at page 2. And again, you will not find any evidence disputing this from the government at sentencing. And therefore, you can't rely on the PSR. The judge couldn't. What about the FBI agent's testimony about what he said the first day? That addressed the guns. No, it said told his son and his brother about the idea, how to sell them, and they agreed to participate. Again, for leader-organizer, merely suggesting that the other two commit the offense is strictly prohibited by the guidelines themselves, which say that that does not show leader-organizer. This court's cases say leader-organizer requires direction and supervisory authority, and there was simply no proof here to show that. Thank you, Your Honors. Thank you, Your Honors. Just to address Mr. Murphy's comments briefly, regarding no evidence to consider regarding the cultural norms, frankly, that's something difficult to prove because even if the cultural norms were shown via scholarly articles and things like that, there's not necessarily any evidence that Ms. Zader and Mr. Hertz felt on that issue. I think, frankly, that just the knowledge, the general knowledge of a marital relationship is more compelling there versus anything directly related to the culture that these folks are dealing with. And then regarding the bank accounts, these were, and this was objected to in the pre-sentence report, these were folks that were looking to potentially buy a home in the Cedar Rapids area. They did have legitimate reason for bank accounts. There was nothing unusual about these bank accounts that Ms. Zader set up prior to this trip to Lebanon in March of 2015. But they were used to buy and sell guns, right? The accounts. We conceded that, Your Honor, yes, but eventually they were. Thank you. Very well. The case is submitted. We will take it under consideration.